712 F.2d 740
 SHIPPERS NATIONAL FREIGHT CLAIM COUNCIL, INC., National
Small Shipments Traffic Conference, Inc., Drug and
Toilet Preparation Traffic Conference,
Inc., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
American Trucking Associations, Inc., Intervening Respondent.
 No. 182, Docket 80-4243.
 United States Court of Appeals,
Second Circuit.
 Argued October 4, 1982.
Decided June 13, 1983.
 
 Daniel J. Sweeney, Washington, D.C. (William J. Augello, Augello, Pezold & Hirschmann, P.C., Huntington, N.Y., Steven J. Kalish, McCarthy, Sweeney & Harkaway, Washington, D.C., on brief), for petitioners.
 Evelyn G. Kitay, I.C.C., Washington, D.C. (William F. Baxter, Asst. Atty. Gen., John J. Powers, III, Kenneth P. Kolson, Dept. of Justice, John Broadley, Gen. Counsel, Kathleen M. Dollar, Associate Gen. Counsel, I.C.C., Washington, D.C., on brief), for respondents.
 Kenneth E. Siegel, Washington, D.C. (Nelson J. Cooney, Washington, D.C., on brief), for intervening respondent.
 Before NEWMAN, KEARSE and PRATT, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Petitioners Shippers National Freight Claim Council, Inc., National Small Shipments Traffic Conference, Inc., and Drug and Toilet Preparation Traffic Conference, Inc., which are national associations of shippers and receivers of goods who are concerned with the responsibilities of carriers of those goods, petition for judicial review of orders of the Interstate Commerce Commission ("ICC" or "Commission") dated May 13, August 5, and September 18, 1980, and March 17, 1982, interpreting the Interstate Commerce Act ("Act"), 49 U.S.C. § 10730 (Supp. III 1979 & Supp. IV 1980), to permit a motor carrier to limit its liability for loss of or damage to property it transports, by establishment of a rate setting a deductible amount.
 
 
 2
 We deny the petition.
 
 I. BACKGROUND
 A. Statutory Framework
 
 3
 The ability of most common carriers subject to the Act to limit their liability for loss of or damage to property transported by them is governed by 49 U.S.C. § 10730 (Supp. IV 1980).[1] Until mid-1980, § 10730 and its predecessor section provided that a carrier could, if the Commission so authorized, establish transportation rates under which its liability for the property transported would be limited to an amount, reasonable under the circumstances, agreed to in writing between the carrier and the shipper.[2] The arrangement releasing the carrier from a portion of its liability in exchange for a lower transportation rate is commonly referred to as a "released rate" or "released value rate." See New Procedures in Motor Carrier Restructuring Proceedings, 359 I.C.C. 399, 427-30 (1978) ("1978 Motor Carrier Restructuring Proceedings "). Prior to July 1980, § 10730 read, in pertinent part, as follows:
 
 
 4
 § 10730. Rates and liability based on value
 
 
 5
 The Interstate Commerce Commission may require or authorize a carrier providing transportation or service subject to its jurisdiction under subchapter I, II, or IV of chapter 105 of this title [see note 1 supra ], to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation.
 
 
 6
 49 U.S.C. § 10730 (Supp. III 1979). This provision applied to all interstate common carriers of property, other than water carriers, and required that Commission approval be obtained before released rates could be established.
 
 
 7
 In 1980, § 10730 was amended by two statutes that provided relaxed regulatory requirements for the establishment of released rates by motor carriers of property other than household goods and rail carriers. First, in June 1980, Congress passed the Motor Carrier Act of 1980, Pub.L. No. 96-296, 94 Stat. 793 (July 1, 1980), which was designed to increase competition and to reduce regulation in the trucking industry. 126 Cong.Rec. S3592 (daily ed. Apr. 15, 1980) (remarks of Sen. Packwood, one of the bill's sponsors). Section 12 of the Motor Carrier Act, which became effective on July 1, 1980, divided § 10730 into two subsections. Subsection (a) consisted of the prior § 10730 but was made inapplicable to motor carriers of nonhousehold property. The new subsection (b) allowed a motor carrier of nonhousehold property to establish released rates without prior approval of the Commission, but provided that the Commission could require the carrier to have in effect full liability rates as well.
 
 
 8
 Second, in October 1980, Congress passed the Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat. 1895 (Oct. 14, 1980), which was designed to improve financial and operating conditions of the national rail system "through financial assistance and freedom from unnecessary regulation." H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 80 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 4110, 4111 ("Conference Report"). Sections 211(a) and (b) of the Staggers Act, which became effective on October 14, 1980, further amended 49 U.S.C. § 10730 by (1) making § 10730(a) inapplicable to rail carriers, and (2) adding a subsection (c) applicable to rail carriers, expressly mentioning that deductibles could be provided for in the released rates. Like § 10730(b) with respect to motor carriers of nonhousehold property, § 10730(c) allowed rail carriers to establish released rates without Commission approval; unlike § 10730(b), § 10730(c) did not specify that the released rate must be "reasonable under the circumstances" and did not give the Commission power to require that full liability rates also be maintained. Section 10730, as amended by the 1980 statutes,[3] reads, in pertinent part, as follows:
 
 
 9
 (a) The Interstate Commerce Commission may require or authorize a carrier (including a motor common carrier of household goods but excluding any other motor common carrier of property and excluding any rail carrier) providing transportation or service subject to its jurisdiction under subchapter I, II, or IV of chapter 105 of this title, to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation....
 
 
 10
 (b)(1) Subject to the provisions of paragraph (2) of this subsection, a motor common carrier providing transportation or service subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title may, subject to the provisions of this chapter ... establish rates for the transportation of property (other than household goods) under which the liability of the carrier for such property is limited to a value established by written declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.
 
 
 11
 (2) Before a carrier may establish a rate for any service under paragraph (1) of this subsection, the Commission may require such carrier to have in effect and keep in effect, during any period such rate is in effect under such paragraph, a rate for such service which does not limit the liability of the carrier.
 
 
 12
 (c) A rail carrier providing transportation or service subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title may establish rates for transportation of property under which the liability of the carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier, and may provide in such written declaration or agreement for specified amounts to be deducted from any claim against the carrier for loss or damage to the property or for delay in the transportation of such property.
 
 
 13
 B. Events Leading to the Present Petition for Review
 
 
 14
 In February 1980, Interstate International, Inc. ("Interstate"), a freight forwarder engaged in assembling, consolidating, and transporting shipments of property, applied to the ICC for authority to establish released rates on shipments of used household goods. According to the application, the proposed rates were to represent a "fundamental change" in the manner of computing released rates because the basis for calculating the carrier's maximum liability would be volume, instead of the usual referent of weight. In addition, the new rates were to establish three levels of service, each of which would be accompanied by a different level of carrier liability. Plan A, which provided, inter alia, the fastest and most certain delivery times, was to limit the carrier's liability to $12,000 per unit (400 cubic feet); Plan B, which provided lesser services, was to limit the carrier's liability to $4,000, less a $25 deductible, per unit; and Plan C, which provided the least amount of service, was to limit the carrier's liability to $1,600, less a $50 deductible, per unit. A shipper was to be able to purchase coverage in excess of the amounts specified by the plan chosen.
 
 
 15
 Notice of Interstate's application was published in the Federal Register, 45 Fed.Reg. 17,682 (1980), but the summary of the application emphasized Interstate's proposal to base released rates on volume and did not mention that two of its three released-rate plans contained deductibles. It appears that the application was unopposed, and on May 13, 1980, the Commission's Released Rates Board approved the application, finding that "the concept of a deductible ... is reasonable under the circumstances surrounding the transportation." Interstate International, Inc., Used Household Goods, No. FF-303, at 1 (I.C.C. May 13, 1980).
 
 
 16
 In June 1980, the petitioners, having learned the details of Interstate's application, petitioned for reconsideration by the ICC, on the principal grounds that under common law Interstate was liable for the full extent of loss or damage to property transported by it and that deductibles were not authorized by the Interstate Commerce Act. These petitions were denied on August 5, 1980, by three ICC Commissioners acting as an Appellate Division ("Division 1"), stating, in pertinent part, as follows:
 
 
 17
 The appropriateness of released rates on shipments of household goods has long been recognized by the Commission. Shippers are free to assess the relative merits of Interstate International's innovative method of rating vis-a-vis the competition in making their selection.
 
 
 18
 Petitioners attack the concept of a deductible as inappropriate mainly because it reduces a carrier's interest in the security of freight it transports. However, this is true of all released rates since their only purpose is to reduce a carrier's liability below the actual loss or damage sustained by a shipper. In return, of course, shippers receive the benefit of reduced rates. Consequently, we find that the sought authority to establish and maintain the involved rates has been justified.
 
 
 19
 Interstate International, Inc., Used Household Goods, No. FF-303 (I.C.C. Aug. 5, 1980) ("Division 1 Decision "). Petitioners' request for further administrative review of the Division 1 decision was denied on September 18, 1980, by the Commission, which found petitioners' arguments "unpersuasive." Interstate International, Inc., Used Household Goods, No. FF-303 (I.C.C. Sept. 18, 1980).
 
 
 20
 In December 1981, petitioners petitioned the ICC for a declaratory order that 49 U.S.C. § 10730, as amended through October 1980, did not permit deductibles by carriers other than railroads. They contended that the 1980 amendments, which expressly stated that rail carrier released rates could provide for deductibles, but were silent as to the use of deductibles by other types of carriers, demonstrated that deductibles could not be approved for nonrail carriers. The Commission rejected petitioners' contentions, stating, in part, as follows:
 
 
 21
 An express authorization contained in one section of a statute does not imply pervasive prohibitions in other sections. See American Trucking Association v. Atchison T. & S.F. R.R., 387 U.S. 397, 411 [87 S.Ct. 1608, 1616, 18 L.Ed.2d 847] (1967). Nor can a prohibition against deductibles be read into the language of Subsections 10730(a) and (b). Subsection (a) gives the Commission broad discretion to require or authorize household goods rates under which the carrier's liability is limited to a value established by written declaration of a shipper, when that value would be reasonable under the circumstances surrounding the transportation. Broad discretion is also given the Commission to determine what is reasonable in each circumstance. Discussing the released value provision of 49 U.S.C. 20(11), the predecessor of Section 10730, a court has held that "the Commission has discretion ... to authorize any form of released value provision, so long as it finds the rates that are based on that provision to be just and reasonable under the circumstances and conditions surrounding the transportation." National Motor Freight Traffic Ass'n, Inc. v. I.C.C., 590 F.2d 1180, 1185 (D.C.Cir.1978). Moreover, there is no legitimate reason to distinguish, as petitioners attempt, between released rates and deductibles. Both have similar effects on carrier liability, although each limits it in a somewhat different fashion.
 
 
 22
 Accordingly, we conclude that Section 10730(a) does not limit the kind of value limitation the Commission may approve. We also note that this reasoning is consistent with the policy of the Household Goods Transportation Act of 1980, which declares that maximum flexibility on the part of the carriers in the pricing of their services best serves the shippers of household goods and allows a variety of quality and price options to meet market demands. (See Section 2(a)(3).) The same reasoning applies equally to Section 10730(b). No ban against deductibles is supported by the statutory language of that section.
 
 We find:
 
 23
 The statutory language of 49 U.S.C. 10730 permits deductibles for released rates by written declaration of the shipper or by written agreement between shippers and motor common carriers of household goods, between shippers and other motor common carriers, and between shippers and rail carriers.
 
 
 24
 Petition for Declaratory Order on Deductibles in Household Goods Released Rates, No. 38752, at 4-5 (I.C.C. Mar. 17, 1982).
 
 
 25
 Petitioners seek judicial review in this Court of the Commission's March 17, 1982 declaratory order and its 1980 released-rate orders, urging that the Commission's decisions be vacated and that § 10730 be interpreted to prohibit use of deductibles by nonrail carriers.[4] For the reasons below we deny the petition.
 
 II. DISCUSSION
 
 26
 Petitioners contend that the Commission's decisions should be set aside on the ground that the Commission has arbitrarily and irrationally ignored pertinent canons of statutory construction and has thereby interpreted § 10730 in a manner inconsistent with the intentions of Congress. In particular, petitioners challenge the Commission's authority to allow nonrail carriers to use deductibles on the grounds that (1) since statutes in derogation of the carrier's liabilities at common law should be narrowly construed and since common law prohibited deductibles, the silence of §§ 10730(a) and (b) should not be construed as permitting deductibles; and (2) by explicitly allowing in § 10730(c) the use of deductibles by rail carriers, Congress revealed its intention to deny use of deductibles to other carriers. We reject both arguments.
 
 A. The Common Law Argument
 
 27
 Petitioners' first argument invokes the principle that statutes in derogation of common-law duties should be construed as altering those obligations only to the extent expressly provided. They contend that since common law did not permit deductibles, the silence of §§ 10730(a) and (b) with respect to deductibles may not be construed as permitting deductibles. We find this argument unpersuasive because we are not convinced that common law did indeed prohibit a carrier and a shipper from agreeing on a rate that included a deductible.
 
 
 28
 At common law, absent a contrary agreement between carrier and shipper, a carrier's liability for loss of or damage to goods entrusted to the carrier was virtually unlimited; unless the loss was caused by an act of God, a public authority, a public enemy, or the shipper, or was caused by the inherent vice or nature of the goods themselves, the carrier was liable for the full extent of the loss. See, e.g., Missouri Pacific Railroad v. Elmore & Stahl, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964), and cases cited therein. Further, under common law, courts refused to enforce an agreement between carrier and shipper purporting to relieve the carrier from all liability for loss of property occasioned by the negligence of the carrier or its servants. See Adams Express Co. v. Croninger, 226 U.S. 491, 509, 33 S.Ct. 148, 153, 57 L.Ed. 314 (1913). Such exculpatory contracts were held to violate public policy because they would tend to invite carelessness on the part of the carrier.
 
 
 29
 Nevertheless, common law did recognize as enforceable an agreement between carrier and shipper whereby the carrier's liability for loss of property, including loss occasioned by its own negligence or that of its servants, was not entirely eliminated but was merely limited, so long as the limitation was granted by the shipper in consideration for a lower rate of freight than would reasonably be charged for the carrier's unlimited liability. Hart v. Pennsylvania Railroad, 112 U.S. 331, 340, 5 S.Ct. 151, 155, 28 L.Ed. 717 (1884); see also Boston & Maine Railroad v. Piper, 246 U.S. 439, 444, 38 S.Ct. 354, 355, 62 L.Ed. 820 (1918); George N. Pierce Co. v. Wells, Fargo & Co., 236 U.S. 278, 284, 35 S.Ct. 351, 353, 59 L.Ed. 576 (1915); Adams Express Co. v. Croninger, supra, 226 U.S. at 509-10, 33 S.Ct. at 153. The rationale for enforcing contracts that limited the carrier's liability in such cases was that the carrier was entitled to know the extent of its potential liability for loss of the property and to be compensated in proportion to the risk assumed. Hence the contractual limitation on the carrier's liability was viewed not as the carrier's attempt to exonerate itself from losses negligently caused by it, but rather as the agreement of carrier and shipper in advance on the maximum compensation the shipper would recover should the property be lost or damaged, with the freight rate keyed to the size of the carrier's risk. As the Supreme Court explained in Hart v. Pennsylvania Railroad, supra:
 
 
 30
 The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater. The articles have no greater value, for the purposes of the contract of transportation, between the parties to that contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract, fairly entered into, and where there is no deceit practised on the shipper, should be upheld. There is no violation of public policy.
 
 
 31
 112 U.S. at 340-41, 5 S.Ct. at 155-56.
 
 
 32
 According to Hart, "the proper test to be applied to every limitation of the common-law liability of a carrier [is] its just and reasonable character." Id. at 342, 5 S.Ct. at 156. Accordingly, so long as the limitation of liability was the result of a "fair, open, just and reasonable agreement" between carrier and shipper, entered into by the shipper "for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of risk," Adams Express Co. v. Croninger, supra, 226 U.S. at 509-10, 33 S.Ct. at 153, and the shipper was given "the option of higher recovery upon paying a higher rate," Boston & Maine Railroad v. Piper, supra, 246 U.S. at 444, 38 S.Ct. at 355, the agreement was enforceable at common law.
 
 
 33
 Petitioners argue that these permissive common-law principles do not govern the instant proceeding because a deductible is in essence an exoneration from, rather than a limitation of, liability. The practical accuracy of petitioners' characterization will depend, of course, on the size of the deductible in relation to the intrinsic worth of the property. If the deductible is $50 and the property is worth that amount or less, the effect of choosing the deductible would be to exonerate the carrier from any liability for loss. If the property is worth more than the deductible amount, however, there is no qualitative difference between use of the deductible and use of the more common released rate establishing the shipper's maximum recovery. As the Commission recognized, the "only purpose [of either] is to reduce a carrier's liability below the actual loss or damage sustained by a shipper." Division 1 Decision, supra. Using a deductible, the shipper agrees to forgo recovery of the first X dollars of its loss, whereas under the more common released-rate agreement the shipper agrees to forgo recovery of the last Y dollars of its loss. Either formulation would permit the carrier to limit its liability. We are aware of no authority holding that an agreement for a deductible is unenforceable at common law, and if the agreement were fair and reasonable, were entered into by the shipper in order to gain a lower transportation charge, and the shipper had the option of paying a higher charge to obtain greater coverage, we see no basis for inferring that such an agreement would be unenforceable at common law. Indeed, since "the proper test to be applied to every limitation of the common-law liability of a carrier [is] its just and reasonable character," Hart v. Pennsylvania Railroad, supra, 112 U.S. at 342, 5 S.Ct. at 156 (emphasis added), even agreement on a deductible that exceeded the intrinsic worth of the property might have been enforced at common law if the shipper could thereby have obtained a low freight rate and had the option of paying a higher, reasonable, rate to avoid the deductible.[5]
 
 
 34
 In sum, we disagree with petitioners' premise that an agreement for a released rate including a deductible would necessarily have been unenforceable at common law. Accordingly, we do not view the Commission's authorization of the use of the deductible as a derogation of the common-law liability of the carrier.
 
 B. The Statutory Construction Argument
 
 35
 Petitioners contend that the "plain meaning" of the explicit provision in § 10730(c) for use of deductibles by rail carriers is that Congress intended to prohibit use of deductibles by all other carriers. Mere incantation of the plain meaning rule, however, cannot substitute for meaningful analysis, New York State Commission on Cable Television v. FCC, 571 F.2d 95, 98 (2d Cir.), cert. denied, 439 U.S. 820, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978); see American Trucking Associations v. ICC, 656 F.2d 1115, 1120 (5th Cir.1981), and our analysis of the Interstate Commerce Act prior to 1980 and of the 1980 amendments persuades us that Congress did not intend to prohibit use of deductibles by nonrail carriers.
 
 
 36
 We commence our statutory inquiry with the Act as it was interpreted prior to the 1980 amendments, and we find in the history of the Act nothing to indicate that Congress intended at any time after 1916 to restrict carriers' ability to limit their liability through released rates. Although a restrictive intention had been manifested earlier,[6] in 1916 Congress explicitly authorized the Commission to approve released rates. Congress did not at that time specify what form these limitations of liability might take, and it did not in the intervening years seek in any way to circumscribe the Commission's discretion to approve particular types of contractual limitations on the carrier's liability.
 
 
 37
 In these circumstances, both the Commission and the courts have construed the Commission's authority broadly, ruling that whether to permit or prohibit proffered types of limitations was a matter committed to Commission discretion. For example, in Rules, Regulations, and Practices of Regulated Carriers with Respect to the Processing of Loss and Damage Claims, 340 I.C.C. 515 (1972), the Commission stated as follows:
 
 
 38
 [T]he legislative history of section 20(11) [the predecessor of § 10730] shows that its adoption developed mainly as the result of the situation in which railroads published rates with extremely low released values with the practical result that shippers had a choice of rates in name only because the full actual value rates were too high to be used. In this respect, therefore, the Congress chose to leave it solely in our discretion whether to grant exceptions to the common law rule of full liability based upon the reasonableness and adequacy of a shipper's recovery for loss or damage to cargo in the light of a reduction in the freight charges.
 
 
 39
 Id. at 591 (emphasis added). Similarly, in National Motor Freight Traffic Association v. ICC, 590 F.2d 1180 (D.C.Cir.1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979), the court of appeals affirmed a Commission order that approved a new form of released-rate agreement, noting that
 
 
 40
 the Commission has discretion under § 20(11) [the predecessor to § 10730] to authorize any form of released value provision, so long as it finds the rates that are based on that provision to be just and reasonable under the circumstances and conditions surrounding the transportation.
 
 
 41
 Id. at 1185 (footnote omitted). See also Household Goods Carriers' Bureau v. ICC, 584 F.2d 437, 441 (D.C.Cir.1978) ("We cannot substitute our judgment for that of the Commission in determining what exceptions to carrier liability beyond those at common law are dictated by the national transportation policy.").
 
 
 42
 While none of these decisions ruled on released rates that included deductibles,[7] we agree with the Commission's analysis, see Division 1 Decision, supra, that there is no difference in principle between a deductible, which establishes a floor figure for the shipper's recovery, and an arrangement that sets a ceiling.[8] Either is designed to reduce the carrier's liability below the shipper's actual loss, and we are aware of no authority, legislative, regulatory, or judicial, expressing the view that such a reduction may not be achieved through the use of deductibles.[9]
 
 
 43
 We conclude that Congress's decision to entrust the approval of transportation rates limiting carrier liability to the Commission without any statutory directive confining it to specific types of limited-liability arrangements left the Commission, prior to the 1980 amendments to § 10730, with authority to approve the use of deductibles in the event that a carrier proposed them and the Commission found them to be reasonable.
 
 
 44
 We do not view the 1980 amendments as having deprived the Commission of the authority to permit use of deductibles. As discussed in Part I.A. above, subsections (a) and (b) of § 10730 took substantially their present form with the passage of the Motor Carrier Act in June 1980. Nothing in the legislative history of the Motor Carrier Act suggests that Congress then intended to forbid use of deductibles as a method of limiting a carrier's liability. Indeed, the contrary is suggested. In furtherance of the Motor Carrier Act's general goal of increasing competition in the industry, see H.R.Rep. No. 1069, 96th Cong., 2d Sess. 3 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 2283, 2285 ("Motor Carrier Act Report"), § 12 of the legislation, which modified § 10730, was specifically designed to "foster more competition in the pricing of transportation service," id. at 26, reprinted in 1980 U.S.Code Cong. & Ad.News at 2308. It was envisioned that the availability of a variety of released rates would enhance price competition and reduce the rates a shipper would pay.[10] The variety was likened to greater and lesser amounts of insurance coverage, with the shipper to have the option to forgo coverage entirely, as it might wish to do for property of low value, in order to obtain a lower freight rate. The Motor Carrier Act Report described the thrust of § 12 as follows:
 
 
 45
 Permitting released value rates increases the range of choices available to the shipping public. With a full value rate, a shipper pays one price for two distinct services which are tied together, the actual linehaul of a commodity from one point to another and full insurance on the commodity on that movement. Released rates, in effect, allow the shipper to pay a lesser price for hauling the goods and a separate agreed-upon price for whatever amount of insurance the shipper desires. Consequently, if the commodities are of low value or if the shipper wants to take the risk, the shipper may want only partial insurance or none at all. Having this option should reduce the total price the shipper must pay for the transportation.
 
 
 46
 Id. at 25-26 (emphasis added), reprinted in U.S.Code Cong. & Ad.News at 2307-08.
 
 
 47
 Thus, while the crux of petitioners' complaint is that the practical effect of a deductible for property of low value is to deprive the shipper of any recovery, this appears to be precisely one of the options Congress sought, in the Motor Carrier Act, to have available.
 
 
 48
 Nor do we view Congress's passage of the Staggers Rail Act several months later, with its express recognition that rail carriers could use deductibles, as reason to believe that Congress intended--either when it passed the Motor Carrier Act or when it passed the Staggers Act--to deny deductibles to nonrail carriers. There is nothing to suggest that in passing the railroad legislation Congress believed it was taking away an existing option from nonrail carriers. And there is no indication that either house of Congress conceived of deductibles as a newly available option. Indeed there is some reason to believe that they considered deductibles already authorized.
 
 
 49
 The original Senate version of the railroad legislation, S. 1946, 96th Cong., 1st Sess. (1979), approved by the Senate on April 1, 1980, would have amended § 10730 to permit railroads to establish released rates without Commission supervision and without reference to the "just and reasonable under the circumstances" test. The released-rate language used in S. 1946, i.e.,
 
 
 50
 establish rates for the transportation of property under which the liability of the carrier for such property is limited to a value established by written declaration of the shipper or by written agreement between the carrier and the shipper,
 
 
 51
 was virtually identical to the language of § 10730 as it then existed. Deductibles were not explicitly mentioned, but at least one witness before the Senate Committee that held hearings on S. 1946 in 1979 had expressed the view that the released rates could include deductibles: "We assume that, in permitting liability to be limited 'to a value established' by agreement, the provision permits the parties to agree to deductibles since that is a common insurance practice." 1 Railroad Transportation Policy Act of 1979: Hearings on S. 1946 Before the Senate Comm. on Commerce, Science, and Transportation, 96th Cong., 1st Sess. 603 (1980) (supplemental statement of William H. Dempsey, President of the Association of American Railroads).
 
 
 52
 The origin of the express reference to deductibles was the House of Representatives version of the railroad legislation, H.R. 7235, 96th Cong., 2d Sess. (1980), first approved by the House on September 9, 1980, which proposed the same relaxations with respect to released rates as appeared in S. 1946, but also specified that the released rates could include a deductible. In the Senate, when the two versions of the railroad legislation, which differed in many other respects as well, were about to be sent to conference, there was discussion of some of the other differences between the two bills, 126 Cong.Rec. S12,915-16 (daily ed. Sept. 18, 1980), but the reference in H.R. 7235 to deductibles occasioned no comment. It is a permissible inference that the Senate viewed the difference as one of form, and had agreed with the view that deductibles were implicitly permitted by S. 1946, and hence by § 10730 as it then existed.
 
 
 53
 The Conference Committee eventually recommended adoption of H.R. 7235's treatment of released rates, Conference Report, supra, at 102-03, reprinted in 1980 U.S.Code Cong. & Ad.News at 4134-35, and this was the version that eventually was approved by both houses of Congress. We find no suggestion, however, that Congress believed that adoption of the House language mentioning deductibles constituted a change in the law.[11] The Conference Report described the released rate provision as follows:
 
 
 54
 To provide both shippers and railroads with greater rate-service options the Act permits the establishment of lesser liability requirements than presently assured by law.
 
 
 55
 Conference Report, supra, at 82, reprinted in 1980 U.S.Code Cong. & Ad.News at 4113. The use of deductibles was indeed not "assured" under prior law, because all released rates were subject to Commission approval, and the ICC had been reluctant to approve any type of released rates for railroads even when there was no opposition.[12] See S.Rep. No. 470, 96th Cong., 1st Sess. 32 (1979). But if Congress had viewed deductibles as a form of limitation of liability that the Commission could not have authorized, we would have expected the Conference Report to mention deductibles as a feature not then "available" under the law, rather than simply not "assured."
 
 
 56
 Finally, nowhere in the legislative history do we find any indication that Congress believed it was denying deductibles to carriers other than railroads. So far as we have been able to determine, in discussing the Motor Carrier Act the legislators never discussed released rates for railroads; and in discussing the railroad legislation they never discussed the released-rate structure for motor carriers. Given the absence of any cross-discussion, it hardly seems reasonable to make the "vast leap," urged by petitioners, from the "particular authorization" of deductibles for railroads to "a pervasive prohibition" for nonrail carriers. American Trucking Associations v. Atchison, Topeka & Santa Fe Railway, 387 U.S. 397, 411, 87 S.Ct. 1608, 1616, 18 L.Ed.2d 847 (1967).
 
 
 57
 The petition for review is denied.
 
 
 58
 GEORGE C. PRATT, Circuit Judge, dissenting.
 
 
 59
 My colleagues find no difference "in principle" between a deductible and a released value, and thus conclude that since 1916 Congress has intended a deductible to be a permissible released value limitation under 49 U.S.C. § 10730. As a result they have permitted carriers of household goods, despite contrary statutory language, to disclaim liability for loss, theft, or damage to a householder's property up to the deductible amount. Since I cannot accept their analysis of § 10730, their premise that a deductible is a released value, or the "license to steal" that they grant to carriers of household goods, I dissent.
 
 I.
 
 60
 The issue before us is not whether a deductible should be permitted as a means of limiting carriers' liability--a decision for Congress and not this court--but rather, whether Congress has authorized deductibles for carriers of used household goods in 49 U.S.C. § 10730(a). My colleagues perceive a continuous congressional intent to authorize deductibles that began in 1916. They discern this intent despite a contradictory statutory history that led to the 1916 amendment, despite emphatic statutory language to the contrary, despite the structure and language of the current statute, and despite the absence of any showing that anyone had ever, prior to 1980, advanced the idea of using deductibles in the context of carriers' liability.
 
 
 61
 I can find nothing in Congress's language up to 1916 to suggest anything but disapproval of a deductible or any form of limitation of liability that would exempt the carrier from responsibility for the initial dollars of every loss or damage to the shipper's property. If, as my colleagues believe, Congress in 1916 intended to authorize a deductible, it chose strange language indeed to express that intent.
 
 
 62
 In the relevant portions of the 1916 statute, set forth in the margin,* Congress expressed its basic disapproval of limitations on a carrier's liability: "any such limitation" regardless of form was declared "to be unlawful and void". As an exception to this blanket prohibition, Congress permitted rates that included carefully defined released values as long as they would "have no other effect than to limit liability and recovery to an amount not exceeding the value" declared by the shipper or agreed by the parties to be the "released value" of the goods. This language is precise and readily includes released values. Only by extreme, and in my view unjustified, generalization can it fairly be said to include deductibles.
 
 
 63
 In relevant part the statute remained in its 1916 form until 1978 when Congress enacted Public Law No. 95-473, entitled "An Act To revise, codify, and enact without substantive change the Interstate Commerce Act and related laws subtitle IV of title 49, United States Code, 'Transportation' ". 92 Stat. 1337. This 1978 act was merely a recodification of the prior statutes included in the Interstate Commerce Act. Congress expressly negated any intention to change prior law:
 
 
 64
 Sections 1 and 2 of this Act restate, without substantive change, laws enacted before May 16, 1978, that were replaced by those sections. Those sections may not be construed as making a substantive change in the laws replaced.
 
 
 65
 Pub.L. No. 95-473, § 3, 92 Stat. 1337, 1466 (1978).
 
 
 66
 To replace and restate the elaborate 1916 prohibition against agreements limiting carriers' liability, Congress provided in § 10730 that the Commission may require or authorize a carrier
 
 
 67
 * * * to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation (emphasis added).
 
 
 68
 49 U.S.C. § 10730(a).
 
 
 69
 By Congress's command, this language of § 10730 "may not be construed as making a substantive change" in the prior law, which had expressly declared any limitation of liability to be unlawful and void except an agreement limiting liability and recovery "to an amount not exceeding the [declared or released] value." Thus, Congress in 1978 continued to authorize limitations of liability, but only in terms of an established value of the goods. Since deductibles have nothing to do with the value of the goods, it follows that Congress did not intend in 1978 to permit deductibles.
 
 
 70
 Furthermore, one would think that if Congress had perceived its intent in 1978 as the majority perceives it now--to permit deductibles as well as released values--Congress would have expressed that intent specifically, just as it did two years later. In 1980 Congress passed three amendments substantially revising the Interstate Commerce Act, one of which did specifically authorize deductibles for railroads. When read together, these three amendments simply and directly confirm that Congress did not intend to authorize deductibles in the transportation of household goods, the specific issue now before the court.
 
 
 71
 Prior to 1980 Congress had applied the same statute, § 10730, to various types of carriers, including railroads, motor carriers of household goods, and other motor carriers. All three of these carriers (1) needed advance approval of their rates, (2) were permitted to offer rates under which the carrier's liability was "limited to a value" established by declaration or agreement, and (3) were required to establish limiting values that were "reasonable under the circumstances surrounding the transportation." 49 U.S.C. § 10730 (Supp. II 1978). The 1980 amendments divided § 10730 into three subsections, one for each of these carriers, and treated each carrier differently with respect to these three requirements.
 
 
 72
 The "Staggers Rail Act," Pub.L. No. 96-448, 94 Stat. 1895, passed October 1, 1980, no longer required railroads either to have their rates approved in advance, or to establish released values that were reasonable. Railroads were specifically authorized to use deductibles, which were described as "specified amounts to be deducted from any claim against the carrier for loss or damage to the property or for delay in the transportation of such property." Pub.L. No. 96-448, 94 Stat. 1911; 49 U.S.C. § 10730(c) (Supp. IV 1980).
 
 
 73
 The "Motor Carrier Act of 1980," Pub.L. No. 96-296, 94 Stat. 793, passed June 20, 1980, released motor carriers of other than household goods, like the railroads, from the requirement of advance approval of rates. Congress continued the authorization for released value rates and the requirement that their declared or agreed values be reasonable. Unlike the railroads, these carriers were not expressly authorized to use deductibles. 49 U.S.C. § 10730(b) (Supp. IV 1980).
 
 
 74
 In the "Household Goods Transportation Act of 1980", Pub.L. No. 96-454, 94 Stat. 2011, passed September 30, 1980, Congress was significantly more restrictive with carriers of household goods than it was with the other carriers. Unlike the railroads and other motor carriers, it continued to require advance approval of rates by the commission. Unlike the Staggers Act and the Motor Carrier Act, the Household Goods Transportation Act continued to require advance approval of rates by the commission. Unlike the Staggers Act, it required that the released values be reasonable, and did not expressly authorize deductibles. 49 U.S.C. § 10730(a) (Supp. IV 1980).
 
 
 75
 My colleagues' interpretation of the amended § 10730, insofar as they find deductibles included in the released value provisions, distorts the plain language of the statute and renders the deductible provision in subsection (c) surplusage, thereby violating the elementary canon of construction that courts must give effect to every word in a statute. Bird v. United States, 187 U.S. 118, 124, 23 S.Ct. 42, 44, 47 L.Ed. 100 (1902); Platt v. Union Pacific R.R. Co., 99 U.S. 48, 58, 25 L.Ed. 424 (1878). It also frustrates some of the policy aims Congress sought to achieve in the 1980 amendments.
 
 
 76
 If, as the majority holds, the commission is now properly exercising some latent authority to approve deductible limitations for carriers of household goods covered by subsection (a), it would seem to follow from the identical language in the Motor Carrier Act, codified at 49 U.S.C. § 10730(b), and taken from the same source in the 1916 statute, that Congress must also have intended to permit the other motor carriers to offer rates including a deductible, without first obtaining commission approval. Indeed, the commission has so held. See Decision on Petition for Declaratory Order on Deductibles in Household Goods Released Rates, No. 38752, at 4-5 (I.C.C. Mar. 17, 1982). However, the Motor Carrier Act itself suggests just the opposite, because it restricts sharply any attempt by the commission to deregulate the trucking industry in defiance of the statute. In section 3 of the Act, Congress specifically admonished that
 
 
 77
 * * * the Interstate Commerce Commission should be given explicit direction for regulation of the motor carrier industry and well-defined parameters within which it may act pursuant to congressional policy; that the Interstate Commerce Commission should not attempt to go beyond the powers invested in it by the Interstate Commerce Act and other legislation enacted by Congress; and that the legislative and resulting changes should be implemented with the least amount of disruption to the transportation system consistent with the scope of the reforms enacted.
 
 
 78
 Pub.L. No. 96-296, 94 Stat. 793 (1980). The house report to the Motor Carrier Act cautioned the commission "to stay within the powers specifically vested in it by the revised law." H.R.Rep. 1069, 96th Cong., 2d Sess. 11 (1980) reprinted in 1980, U.S.Code Cong. & Ad.News 2283, 2293.
 
 
 79
 Despite this rather clear language, the majority reasons that prior to 1980, Congress "entrust[ed] the approval of transportation rates to the Commission without any statutory directive," and finds nothing in the 1980 amendments "as having deprived the Commission of the authority to permit the use of deductibles." Such a permissive, broad reading of § 10730 seems inconsistent with the narrow interpretation both enacted and urged by Congress, and it substantially undermines Congress's attempts to rein in the commission.
 
 
 80
 Even were I to disregard Congress's strong historical leanings toward prohibiting limitations of carriers' liability, the language that Congress used in 1980 to restructure these three branches of the industry would still convey to me an intention that rail carriers should have deductibles, but motor carriers should not. And when I read these amendments in light of Congress's earlier hostility to limitations of liability, this intention becomes inescapably clear.
 
 II.
 
 81
 Central to my disagreement with the majority is their premise that deductibles do not differ from released value limitations. The majority artfully defines the released value provision in subsection (a) of § 10730 to include both released value limitations and deductibles, and therefore can logically conclude that § 10730(a) permits the commission to approve rates with a deductible limitation. However, the term "released value" has a specific and narrower meaning, which in light of prior case law and common sense cannot fairly be read to include a deductible.
 
 
 82
 As my colleagues acknowledge, the common law considered void, as against public policy, any agreement or limitation that insulated a carrier from liability for its own negligence or for the willful acts of its employees. And I acknowledge that the common law recognized an exception for agreements, known as released value limitations, whereby "the carrier's liability for loss of property, including loss occasioned by its own negligence or that of its servants, was not entirely eliminated but was merely limited," at p. 746, to a stated value in consideration for a lower rate. See Adams Express Co. v. Croninger, 226 U.S. 491, 512, 33 S.Ct. 148, 154, 57 L.Ed. 314 (1913). We disagree over whether a deductible is the same as a released value.
 
 
 83
 They are not the same, and the differences are significant. When liability is limited to a released value, the carrier is fully liable for all loss or damage up to the agreed or declared value of the shipment; when a loss occurs the shipper is estopped from asserting that the value of the shipped goods exceeded what he had declared in advance. As the Supreme Court noted in Adams Express, supra,
 
 
 84
 It is not in any proper sense a contract exempting him from liability for the loss, damage, or injury to the property, as the shipper describes it in stating its value for the purpose of determining for what the carrier shall be accountable upon his undertaking, and what price the shipper shall pay for the service and for the risk of loss which the carrier assumed.
 
 
 85
 Adams Express Co. v. Croninger, supra at 512, 33 S.Ct. at 154, quoting Bernard v. Adams Express Co., 205 Mass. 254, 259, 91 N.E. 325, 327 (1910). The common law's intolerance of agreements exonerating carriers for their own negligence or misconduct was thus relaxed in recognition of the obvious fact that the cost of transporting goods was inextricably bound to the risks that carriers must assume for their damage or loss. By fixing a maximum value in advance, the carrier could know what degree of care was required, and the shipper was assured of recovery of his losses up to the amount declared.
 
 
 86
 A deductible has a different effect, because it exonerates the carrier from all liability up to the deductible amount. A deductible does not discourage carrier negligence or theft: it imposes no liability on the carrier for many losses and excuses at least part of every loss. In contrast, a limitation based on a released value encourages care because it imposes some liability on the carrier for every loss. Thus, it is simply not accurate to say there is no difference "in principle" between a deductible and a released value limitation.
 
 
 87
 In Hart v. Pennsylvania R.R. Co., 112 U.S. 331, 5 S.Ct. 151, 28 L.Ed. 717 (1884), which the majority quotes approvingly, at p. 746, the Supreme Court carefully analyzed why a released value did not contravene the common law prohibition against limitations on a carrier's liability, (at p. 746).
 
 
 88
 The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater. The articles have no greater value, for the purposes of the contract of transportation, between the parties to that contract. The carrier must respond for negligence up to that value.
 
 
 89
 Hart v. Pennsylvania R.R. Co., 112 U.S. at 340-41, 5 S.Ct. at 155-56.
 
 
 90
 The majority interprets this analysis of released value limitations to authorize deductibles because there is no "qualitative" difference between them "in principle". However, the following sentence-by-sentence breakdown of the Supreme Court's analysis demonstrates that a deductible is not the same as a released value, "in principle" or otherwise:
 
 
 91
 Released Value Deductible
(As described in Hart, 112
 U.S. at 340-41 [5 S.Ct. at
 155-56].)
"The limitation as to value has A deductible is designed to
no tendency to exempt from exempt from liability for
liability for negligence." negligence."
"It does not induce want of A deductible does induce want
care." of care and even petty theft.
"It exacts from the carrier the A deductible exacts from the
measure of care due to the carrier no care up to the
value agreed on." deductible amount.
"The carrier is bound to Below the deductible value the
respond to that value for carrier is exempt from its
negligence." negligence.
"The compensation for carriage The compensation for carriage
is based on that value." is not directly related to the
 amount of a deductible.
"The shipper is estopped from A deductible is unrelated to the
saying that the value is greater. value of the articles.
The articles have no greater
value, for the purposes of the
contract of transportation,
between the parties to that
contract."
"The carrier must respond for The carrier is exempt from
negligence up to that value." liability up to the deductible
 amount.
 
 
 92
 In short, because of the fundamental differences between them, deductibles cannot be permitted as simply another form of released value.
 
 III.
 
 93
 By enacting the Household Goods Act of 1980--which the majority has not mentioned, even though this case involves carriers of household goods--Congress demonstrated its concern for the problems faced by the relatively unsophisticated shipper of household goods. As noted by the house committee:
 
 
 94
 [T]hese shippers usually move only once or twice in their lives and, consequently, lack thorough understanding of the industry and sufficient clout to negotiate with it. Their situation is made more vulnerable by the fact that the moves involve all of their personal possessions, which often are of a fragile nature.
 
 
 95
 H.Rep. No. 96-1372, reprinted in 1980 U.S.Code Cong. & Ad.News 4271, 4272. The committee further noted, that the household goods moving industry "is the single most frequent subject of consumer complaints to the Interstate Commerce Commission," id., and that approximately half of those complaints relate to the loss or damage of goods--precisely the area where a deductible has its primary impact. In order better to protect consumer shippers of household goods, Congress authorized several new devices, including written binding estimates of charges, guaranteed pick-up and delivery times backed by penalties or per diem payments for delay, as well as provisions for informal dispute settlement programs to be established by carriers of household goods for the purpose of resolving shipper disputes in a fair, expeditious, and inexpensive manner. The amendment also restructured the penalty provisions of the act relating to the transportation of household goods in order to "place new emphasis on the need for carriers to minimize shipper harm and to encourage compensation when harm does occur." Id. at 4285.
 
 
 96
 Thus, Congress demonstrated in 1980 a major change in its approach to the regulations of household goods carriers. It added several new protections for the consumer, but carefully balanced them by eliminating some unnecessary regulation of the carriers. The majority, however, ignores this change and by today's decision significantly skews Congress's carefully crafted program for protecting movers of household goods. By reaching back to 1916 to discover a latent intent to authorize deductibles, one that was neither expressed nor exercised in the ensuing sixty years, the majority undermines the legislature's newly enhanced concern for householders. As petitioners colorfully argue, because the particular tariff under review grants the carriers a "license to steal" from each householder up to the deductible amount, it thereby removes much of the added consumer protection that Congress sought to create.
 
 
 97
 The petition for review should be granted and the commission's order should be vacated.
 
 
 
 [1]
 The jurisdictional provisions of the Act are contained in chapter 105, 49 U.S.C. §§ 10501-10562 (Supp. IV 1980), which gives the Commission jurisdiction over most transportation by interstate rail, rail-water, and pipeline carriers (Subchapter I); by interstate motor carriers (Subchapter II); by interstate water carriers (Subchapter III); and by interstate freight forwarder services (Subchapter IV). Section 10730 governs all of these except water carriers
 
 
 [2]
 The section governing carriers' ability to limit their liability was numbered 10730 in 1978 by the Revised Interstate Commerce Act, Pub.L. No. 95-473, 92 Stat. 1337 (1978), which recodified the Interstate Commerce Act without substantive revision. H.R.Rep. No. 1395, 95th Cong., 2d Sess. 4 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 3009, 3013. Prior to the recodification, the provision had been codified as part of 49 U.S.C. § 20(11) (1976) (carrier may be authorized "by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property")
 
 
 [3]
 In 1980 Congress also enacted legislation with respect to the transport of household goods. See Household Goods Transportation Act of 1980, Pub.L. No. 96-454, 94 Stat. 2011 (Oct. 15, 1980). This statute retained the restrictions of the pre-1980 § 10730 with respect to motor carriers of household goods notwithstanding its elimination of other federal regulation
 
 
 [4]
 Petitioners initially had petitioned this Court for judicial review of the released-rate orders in December 1980. That petition was withdrawn in order to permit petitioners to seek declaratory relief from the Commission or legislative relief from Congress
 
 
 [5]
 On the other hand, a sizeable deductible in connection with small shipments, unaccompanied by the option for greater coverage at a higher rate, would undoubtedly have been disapproved at common law and would likely be disapproved by the Commission, which in 1978 expressed its "concern[ ] about the small shipper who cannot [absorb losses due to increased risk in conjunction with released rates] and who, therefore, requires that the carrier accept greater liability." 1978 Motor Carrier Restructuring Proceedings, supra, 359 I.C.C. at 433. Thereafter, prior to the 1980 amendments to § 10730, the Commission promulgated rules requiring that any small shipments tariff containing released rates include a rate under which the carrier would assume full common carrier liability and requiring that the released and full value rates be reasonable and bear a reasonable relationship to one another. Released Rates in Conjunction with a Small Shipments Tariff, 362 I.C.C. 614, 617 (1980)
 
 
 [6]
 In 1906, Congress had passed the Carmack Amendment to the Interstate Commerce Act, ch. 3591, sec. 7, 34 Stat. 584, 593-95 (1906), which provided that no contract, rule, receipt, or regulation could exempt a carrier from full liability. The courts, however, read this directive as nothing more than a codification of common-law principles, and they continued to uphold reasonable released-rate agreements, reasoning that such arrangements were not exemptions from liability but "agreement[s] as to the method by which the carrier would have to account to the shipper in case of loss." Mulcahy, Motor Carrier Cargo Liability--An Overview, 49 I.C.C.Prac.J. 257, 260 (1982) (citing, inter alia, Adams Express Co. v. Croninger, supra ). Congress responded in 1915 by passing the first Cummins Amendment, ch. 176, 38 Stat. 1196 (1915), which prohibited all released-rate arrangements except in the case of goods that were concealed and whose character was unknown to the carrier. Within a year, however, Congress determined that the first Cummins Amendment was too restrictive; it passed the second Cummins Amendment, ch. 301, 39 Stat. 441 (1916), which returned to the common-law practice of permitting released rates, but permitted such arrangements only if authorized by the ICC
 
 
 [7]
 We are unimpressed by petitioners' observation that prior to the Interstate application, the Commission had never approved a rate that included a deductible. The Commission represents, and there is no contrary indication in the record, that no carrier had ever before sought such approval
 Nor, however, are we influenced by the Commission's contention that in 1978 Motor Carrier Restructuring Proceedings, supra, 359 I.C.C. at 434, it had "indicated ... that [deductibles] clauses are an acceptable and legitimate means of limiting carrier liability." (ICC brief at 34.) We find the reference to deductibles in that report rather ambiguous, and since the Commission's characterization is made in a litigation document rather than an administrative order of the type to which we would ordinarily feel constrained to defer, see, e.g., National Motor Freight Traffic Association v. ICC, supra, 590 F.2d at 1185, we place no reliance on the report or the Commission's characterization of it.
 
 
 [8]
 Petitioners argue that a deductible is fundamentally different from the traditional released rate because the latter represents the value of the property shipped, whereas the former is a predetermined amount to be subtracted from that value. This contention misperceives the thrust of the term "value" in § 10730. The reference in that section to "a value established by written declaration of the shipper, or by written agreement," is not a reference to the intrinsic worth of the property but rather to the maximum compensation that the parties agree the shipper may recover for a loss. Cf. George N. Pierce Co. v. Wells, Fargo & Co., supra, 236 U.S. at 285, 35 S.Ct. at 353 ("[T]he legality of the contract does not depend upon a valuation which shall have a relation to the actual worth of the property."). Likewise at common law there was no requirement that the agreed "value" have any relation to the property's intrinsic worth. See id. at 283-85, 35 S.Ct. at 353-54; see also Hart v. Pennsylvania Railroad, supra, 112 U.S. at 341, 5 S.Ct. at 156 (shipper and carrier may agree to liquidated damages)
 
 
 [9]
 We disagree with petitioners' contention that in Secretary of Agriculture v. United States, 350 U.S. 162, 76 S.Ct. 244, 100 L.Ed. 173 (1956), the Supreme Court ruled that deductibles were an unlawful limitation of the carrier's liability. At issue before the Court was the ICC's approval of a tariff that included a 3% "claims tolerance" to be deducted from every claim against a railroad with regard to transportation of eggs. (We note parenthetically our disagreement with petitioners' characterization of these "tolerances" as a type of deductible, and note also that the characterization contradicts petitioners' own argument (see note 7 supra ) that the Commission had never before 1980 approved a deductible.) The Supreme Court reversed the district court's approval of the ICC order solely on the ground that the ICC had failed to support its decision with "findings upon which [the Court] can say that the Commission's conclusion was reasonably based." Id. at 167, 76 S.Ct. at 248. The Court expressly declined to consider the shippers' argument that such "tolerances" were a forbidden form of limitation of liability. Id. at 165-66, 76 S.Ct. at 246-47
 
 
 [10]
 Like the Motor Carrier Act and the Staggers Rail Act, the Household Goods Transportation Act, Pub.L. No. 96-454, 94 Stat. 2011 (Oct. 15, 1980), sought to establish "maximum carrier flexibility in pricing." H.R.Rep. No. 1372, 96th Cong., 2d Sess. 5 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 4271, 4275
 
 
 [11]
 Petitioners rely on an ICC report to Congress one year after the 1980 amendments were enacted as support for their proposition that deductibles were not permitted before the Staggers Rail Act was passed. The report contained the following statement:
 A second change made by the Staggers Act was to permit deductibles. Prior to the Staggers Act, released rates were rates lower then [sic ] full value rates which carried a limitation on the amount of damages recoverable in the event of loss or damage. Released rates may now specify a deductible in addition to the stated limitations on the amount recoverable.
 Rail Carriers Cargo Liability Study, Ex Parte No. 403, at 8-9 (I.C.C. Oct. 9, 1981), as quoted in Petitioners' brief at 18 n. *. While this 1981 statement might be read as indicating the belief that petitioners ascribe to the Commission, such a reading is squarely contradicted, insofar as nonrail carriers are concerned, by the Commission's 1980 rulings on Interstate's application to use deductibles and on petitioners' requests for reconsideration, and its 1982 ruling on petitioners' request for a declaratory order, all quoted in Part I.B. supra. We think it more likely that the statement reflected the practical fact that, as recognized by the Senate, the ICC had been hesitant prior to the 1980 amendments, even when there was no opposition, to approve any sort of released rates by railroads. See S.Rep. No. 470, 96th Cong., 1st Sess. 32 (1979).
 
 
 [12]
 These factors and Congress's desire to "assure" that deductibles would be permitted may provide a clue to why Congress would take pains to specify that railroads were entitled to use deductibles if it believed that deductibles were a form of limitation of liability the Commission previously could have authorized. By simply eliminating the ICC's authority to review railroads' released rates, Congress removed the uncertainty inhering in the subjection of those rates to administrative review. But that simple elimination of ICC review also made it less certain that released rates would pass muster on judicial review. Under the prior regulatory scheme, if the Commission had approved a released rate including a deductible, a reviewing court would likely have deferred to the Commission's discretion and upheld the limitation of liability, see, e.g., National Motor Freight Traffic Association v. ICC, supra; without that layer of administrative insulation between the railroad and a court reviewing its released-rate structure, however, the outcome of judicial review would be a good deal less certain. Thus, it may well be that in explicitly mentioning deductibles Congress simply meant to "assure" that this type of liability limitation, which had not previously been used, would not be set aside by the courts on the basis of its novel form
 
 
 *
 [A]ny common carrier * * * shall be liable to the lawful holder [of a receipt or bill of lading] for any loss, damage, or injury to such property caused by it * * *, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever, shall exempt such common carrier * * * from the liability imposed; and any such common carrier * * * shall be liable to the lawful holder of said receipt or bill of lading * * * for the full actual loss, damage, or injury to such property * * *, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading * * *; and any such limitation, without respect to the manner or form in which it is sought to be made is declared to be unlawful and void; * * * Provided, however, That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply, first, * * *; second, to property * * * concerning which the carrier shall have been or shall be expressly authorized * * * to establish and maintain rates dependent upon the value declared in writing by the shipper and agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released, * * *
 49 U.S.C.A. § 20(11) (West 1951).